IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* [UNDER SEAL], THE STATE OF ILLINOIS, <u>THE STATE OF CALIFORNIA, THE STATE OF GEORGIA, THE STATE OF MARYLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE STATE OF WASHINGTON and THE DISTRICT OF COLUMBIA,</u> | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No: 3:15-cv-00561-DRH-DGW *SEALED* |
| v. | ) ) | JURY TRIAL DEMANDED |
| CEP AMERICA, LLC and CEP AMERICA-ILLINOIS, P.C., CEP AMERICA-GEORGIA, P.C., CEP AMERICA-TENNESSEE, P.C., CEP AMERICA-TENNESSEE, PLLC, CEP AMERICA -TEXAS PLLP, CEP AMERICA-MARYLAND, P.C., CEP AMERICA-MARYLAND, LLP, CEP AMERICA-WASHINGTON, PLLC, CEP AMERICA-WASHINGTON II, P.C., CEP AMERICA-DISTRICT OF COLUMBIA I, P.C. and CEP AMERICA-DISTRICT OF COLUMBIA, LLP. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### FIRST AMENDED COMPLAINT

Plaintiff and Relator Keith Werner, through his undersigned counsel, for his <u>First Amended</u> Complaint against Defendants, CEP AMERICA, LLC, CEP AMERICA-ILLINOIS, P.C., CEP AMERICA-GEORGIA, P.C., CEP AMERICA-TENNESSEE, P.C., CEP AMERICA-TENNESSEE, PLLC, CEP AMERICA-TEXAS, PLLP, CEP AMERICA-MARYLAND, P.C., CEP AMERICA-MARYLAND, LLP, CEP AMERICA-

WASHINGTON, PLLC, CEP AMERICA-WASHINGTON II, P.C., CEP AMERICA-DISTRICT OF COLUMBIA I, P.C., and CEP AMERICA-DISTRICT OF COLUMBIA, LLP, ("Defendants"), states as follows:

## I.      NATURE OF THE CASE

1.      This is an action brought under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. and the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq*., to recover damages and civil penalties from Defendants on behalf of the United States of America and the States of Illinois, California, Georgia, Maryland, Tennessee, Texas, Washington, and the District of Columbia (collectively, the "Government").

2.      CEP AMERICA, LLC ("CEP"), for many years, has been engaged in a fraudulent scheme whereby it causes the physicians it employs, called hospitalists and emergency physicians, to create records seeking payment from medical insurers for higher and more expensive levels of medical service than were actually performed - a practice commonly referred to as "upcoding."  CEP then submits those upcoded records for payment to the Government.  Upon information and belief, a large percentage of CEP revenues come from Government medical insurers, including Medicare and Medicaid.  Upon information and belief, CEP's upcoding scheme has caused those Government health insurers to overpay millions of dollars to CEP, and has adversely impacted patient care.

3.      The Relator, Keith Werner ("Relator" or "Werner"), is a nurse in the Intensive Care Unit ("ICU") at Memorial Hospital in Belleville, Illinois, with 33  years of experience in this field. As part of his job in the ICU, Werner has the responsibility for overseeing care delivered to patients and interacts with many different physicians in the ICU. In addition, Werner has the opportunity to interact with physicians in the Emergency Department (ER). In

the course of performing his duties, Werner noticed that those physicians who were employed

by CEP were upcoding their billing while physicians who were not employed by CEP were

not. Troubled by CEP's apparent upcoding scheme, Werner reviewed  billing records from

various CEP hospitalists and ER physicians that confirmed  CEP's scheme.  Those limited

records personally reviewed by Werner, which represent only a small fraction of the billing

records created by CEP hospitalists and emergency room physicians, demonstrate the

following:

> • CEP trains and/or encourages its hospitalists, emergency room physicians and nurse practitioners to upcode.  CEP's influence in this regard can be seen by comparing the billing records of CEP hospitalists from before they became involved with CEP with the billing records of those same CEP hospitalists and emergency room physicians after they have received CEP's training and become assimilated into CEP's upcoding culture.

> • CEP hospitalists, emergency room physicians and nurse practitioners disproportionately billed at the highest level billing codes established by Government insurers.  A review of multiple different billing records prepared by multiple different CEP hospitalists and emergency room physicians reveals those hospitalists and emergency room physicians submitted a bill in connection with the patient admissions or treatment process at the highest of three possible levels an overwhelming majority of the time and at rates far exceeding non-CEP providers.

> • CEP hospitalists, emergency room physicians and nurse practitioners routinely billed at the highest level – critical care time – for care that did not qualify as critical care time.

4.      CEP is a rapidly growing corporation which, if unchecked, will continue to

submit false claims for reimbursement for upcoded services, causing the already-strained

Medicare and Medicaid systems to overpay millions of dollars to CEP, and continue to

adversely impact patient care, all in violation of the False Claims Act.

5.      The False Claims Act prohibits knowingly presenting (or causing to be

presented) to the Government a false or fraudulent claim for payment or approval.  The False

Claims Act also prohibits knowingly making or using a false or fraudulent record or statement to get a false or fraudulent claim paid or approved by the Government.  In addition, the False Claims Act prohibits conspiring with another person to defraud the Government by getting a false or fraudulent claim allowed or paid.  The False Claims Act also prohibits knowingly making or using a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.  Any person who violates the Federal False Claims Act is liable for civil penalties of up to $11,000 for each violation, plus three times the amount of the damages sustained by the Government.

6.      The False Claims Act allows any person having information about false or fraudulent claims to bring an action on behalf of the Government, and to share in any recovery.  Relator states that all allegations in this Complaint are based on evidence obtained directly by Relator independently and through his own labor and efforts.  The information and evidence that Relator has obtained or of which Relator has personal knowledge, and on which these allegations of False Claims Act violations are based, consist of documents, computer data, conversations with authorized agents and employees of CEP, and conversations with other medical professionals at Memorial Hospital in Belleville, Illinois.  Relator is therefore an original source of the information alleged herein, and has provided that information to the Government in advance of filing this action.

7.      Pursuant to 31 U.S.C. § 3730(b)(2), Relator is providing the Federal Government and the Attorneys General of the States of California, Georgia, Illinois, Maryland, Tennessee, Texas, Washington and Washington, D.C. with a copy of the Complaint and a

written disclosure of substantially all material evidence and material information in Relator's possession.

8.      In accordance with 31 U.S.C. § 3730(b)(2), the Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on Defendant until the Court so orders.

9.      Based upon these and other provisions of the False Claims Act, and similar state statutes described herein, Werner seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Acts. Werner also reserves the right to invoke, as necessary, the provisions of the Acts providing for additional protections against and remedies for retaliation on account of lawful acts done in furtherance of this action.

## II.    PARTIES

10.     Plaintiff and Relator Keith Werner resides in Madison, Illinois, and has been employed by Memorial Hospital as a critical care registered nurse ("RN") since 2001 through the present. Werner has direct and independent knowledge of the false claims alleged in this Complaint, and brings this action for violation of the False Claims Act on behalf of himself and the Government.

11.     Defendant CEP AMERICA, LLC is a limited liability corporation organized under the laws of Delaware, with its principal place of business at 2100 Powell St., Suite 900, Emeryville, California. CEP transacts business and, through various affiliates and subsidiaries, provides medical services to patients covered by Medicare and Medicaid in Arizona, California, Georgia, Maryland, Missouri, Oregon, Tennessee, Texas, Washington, Washington, D.C. and Illinois, including this District.  CEP provides all of the non-medical,

administrative and management services - including billing services - necessary for the operations of each of its subsidiaries and affiliates pursuant to long-term management agreements. CEP AMERICA, LLC is also licensed in Illinois as a foreign corporation doing business in Illinois.  On information and belief CEP AMERICA, LLC employs hospitalists, emergency room physicians and nurse practitioners.

12.     Defendant CEP AMERICA-ILLINOIS, P.C. is a corporation organized under the laws of Illinois, and is a subsidiary of CEP AMERICA, LLC that employs hospitalists, emergency room physicians and nurse practitioners. The principal place of business is located at 2100 Powell St., Suite 900, Emeryville, California, 94608. The registered agent address is Registered Agent Solutions, 901 S. 2nd St., Suite 201, Springfield, Illinois, 62704.

13.     Defendant CEP AMERICA-GEORGIA, P.C. is a corporation organized under the laws of Georgia, and is a subsidiary of CEP AMERICA, LLC that, upon information and belief, employs hospitalists, emergency room physicians and nurse practitioners. The principal place of business is located at 2100 Powell St., Suite 900, Emeryville, California, 94608. The registered agent address is 900 Old Roswell Lakes Parkway, Suite 310, Roswell, Georgia, 30076. CEP AMERICA, LLC is also licensed in Georgia as a foreign corporation doing business in Georgia.

14.     Defendant CEP AMERICA-TENNESSEE, P.C. is a corporation organized under the laws of Tennessee, and is a subsidiary of CEP AMERICA, LLC that, upon information and belief, employs hospitalists, emergency room physicians and nurse practitioners. The principal place of business is located at 2100 Powell St., Suite 900, Emeryville, California, 94608.

15.     Defendant CEP AMERICA-TENNESSEE, PLLC is a corporation organized under the laws of Tennessee, and is a subsidiary of CEP AMERICA, LLC that, upon information and belief, employs hospitalists, emergency room physicians and nurse practitioners. The principal place of business is located at 2100 Powell St., Suite 900, Emeryville, California, 94608. CEP AMERICA, LLC is also licensed in Tennessee as a foreign corporation doing business in Tennessee.

16.     Defendant CEP AMERICA TEXAS PLLP is a corporation organized under the laws of Texas, and is a subsidiary of CEP AMERICA, LLC that, upon information and belief, employs hospitalists, emergency room physicians and nurse practitioners. The principal place of business is located at 2100 Powell St., Suite 900, Emeryville, California, 94608.

17.     Defendant CEP AMERICA-MARYLAND, P.C. is a corporation organized under the laws of Maryland, and is a subsidiary of CEP AMERICA, LLC that, upon information and belief, employs hospitalists, emergency room physicians and nurse practitioners. The principal place of business is located at Unit B, 2nd Floor, 836 Park Ave., Baltimore, MD, 21201. The registered agent address is Registered Agent Solutions, Inc., located at Unit B, 2nd Floor, 836 Park Ave., Baltimore, MD, 21201.

18.     Defendant CEP AMERICA-MARYLAND, LLP is a corporation organized under the laws of Maryland, and is a subsidiary of CEP AMERICA, LLC that, upon information and belief, employs hospitalists, emergency room physicians and nurse practitioners. The principal place of business is located at Unit B, 2nd Floor, 836 Park Ave., Baltimore, MD, 21201. The registered agent address is Registered Agent Solutions, Inc., located at Unit B, 2nd Floor, 836 Park Ave., Baltimore, MD, 21201. CEP AMERICA, LLC is also licensed in Maryland as a foreign corporation doing business in Maryland.

19.     Defendant CEP AMERICA-WASHINGTON, PLLC is a corporation organized under the laws of Washington, and is a subsidiary of CEP AMERICA, LLC that, upon information and belief, employs hospitalists, emergency room physicians and nurse practitioners. Upon information and belief, the principal place of business is located at P.O. Box 1368, Olympia, Washington, 98507. The registered agent address is Registered Agent Solutions, Inc., 3400 Capitol Blvd. S. Suite 101, Olympia, Washington, 98501.

20.     Defendant CEP AMERICA-WASHINGTON II, P.C. is a corporation organized under the laws of Washington, and is a subsidiary of CEP AMERICA, LLC that, upon information and belief, employs hospitalists, emergency room physicians and nurse practitioners. Upon information and belief, the principal place of business is located at P.O. Box 1368, Olympia, Washington, 98507. The registered agent address is Registered Agent Solutions, Inc., 3400 Capitol Blvd. S. Suite 101, Olympia, Washington, 98501. CEP AMERICA, LLC is also licensed in Maryland as a foreign corporation doing business in Maryland.

21.     Defendant CEP AMERICA-DISTRICT OF COLUMBIA I, P.C. is a corporation organized under the laws of District of Columbia, and is a subsidiary of CEP AMERICA, LLC that, upon information and belief, employs hospitalists, emergency room physicians and nurse practitioners. The principal place of business is located at 2100 Powell St., Suite 900, Emeryville, California, 94608. The registered agent address is Registered Agent Solutions, 1090 Vermont Ave. NW, Suite 910, Washington, D.C., 20005.

22.     Defendant CEP AMERICA-DISTRICT OF COLUMBIA, LLP is a corporation organized under the laws of District of Columbia, and is a subsidiary of CEP AMERICA, LLC that, upon information and belief, employs hospitalists, emergency room physicians and nurse

practitioners. The principal place of business is located at 2100 Powell St., Suite 900, Emeryville, California, 94608. The registered agent address is Registered Agent Solutions, 1090 Vermont Ave. NW, Suite 910, Washington, D.C., 20005. CEP AMERICA, LLC is also licensed in the District of Columbia as a foreign corporation doing business in Maryland.

## III.    JURISDICTION AND VENUE

23.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, in particular, the False Claims Act.  Further, 31 U.S.C. § 3732 specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

24.    This Court has supplemental jurisdiction over the subject matter of the claims brought under state laws pursuant to 28 U.S.C. § 1367 because the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Further, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for actions brought under state laws arising from the same transaction or occurrence as an action brought under 31 U.S.C. § 3730.

25.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and Defendants have sufficient minimum contacts with the United States of America so as to satisfy traditional notions of due process. Further, as set forth in more detail herein, a significant portion of the complained of conduct and false claims alleged occurred in this District and the State of Illinois.  Further, Defendants have consented to the jurisdiction of this Court in that  its subsidiary and sister entity, CEP AMERICA-ILLINOIS, P.C., has a registered agent in the State of Illinois, thereby satisfying one of the traditional bases of personal jurisdiction.

26.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 139l(b) and (c) because a substantial part of the events or omissions giving rise to the claim occurred in this District and at least one of the Defendants resides or transacts business in this District.

27.     This action is not based on a public disclosure. It is based on information that is within the direct and independent knowledge of Werner, who has provided the information alleged herein to the Government prior to filing this action.

## IV.     BACKGROUND

28.     CEP is a national physician group practice focused on the delivery of hospital medicine through physicians called hospitalists.

### A.     Hospitalist Services

29.     Hospitalist medicine is a growing medical specialty.  Hospitalists are acute-care physician specialists, who focus on a patient's care exclusively at inpatient facilities, including hospitals, long-term acute care facilities ("LTACs"), and skilled nursing facilities. Hospitalists, who have medical training generally in primary care, assume the inpatient care responsibilities, from admission to discharge, that otherwise would be provided by primary care physicians, specialists, or attending physicians. Hospitalists provide care for patients who do not have a primary care physician; who have a primary care physician who is unavailable; or where it is inefficient or unnecessary for the patient's primary care physician or specialist to visit the hospital. There is no requirement for board certification in critical care.

30.     The number of hospitalists in the United States has grown from an estimated 800 in the mid-1990s to approximately 23,000 in 2007.

**B.**      **Emergency Room Physicians**

31.     Emergency Room Physicians are acute-care and sub-acute care physician specialists, who focus on a patient's care in emergency departments at various health care facilities, usually in emergency departments in hospitals. Emergency Room Physicians generally receive training in a broad spectrum of medical fields, as most hospital admissions come through the emergency department. The role of the Emergency Room Physicians is to assess all potential patients and then treat, admit or discharge the patient. There is no requirement that Emergency Room Physicians be board certified in critical care.

**C.**      **Nurse Practitioners**

32.     According to the International Council of Nurses, a Nurse Practitioner/Advanced Practice Registered Nurse is "a registered nurse who has acquired the knowledge base, decision-making skills, and clinical competencies for expanded practice beyond that of an RN, the characteristics of which would be determined by the context in which he or she is credentialed to practice." Nurse Practitioners treat acute, sub-acute and chronic medical conditions in myriad health care delivery portals from doctors' offices to hospitals. Generally, nurse practitioners are required to perform their duties under the supervision of a doctor, and are able to diagnose conditions, order treatments, prescribe medication, perform certain procedures and make referrals for treatment. The main classifications of a Nurse Practitioner are: Adult (ANP); Acute Care (ACNP); Gerontological (GNP); Family (FNP); Pediatric (PNP); Neonatal (NNP); and psychiatric-mental health (PMHNP).

D.     **CEP**

33.     According to its website, "CEP America is one of the leading providers of acute care management and staffing solutions in the nation." It is a national hospitalist group practice that employs, through various subsidiaries and affiliates, approximately 1700 various physician partners, including physicians, nurse practitioners and physician assistants. CEP provides its physician partners with administrative services - including marketing, technology, and billing and collection services - that reduce the burdens associated with practicing medicine. In return, upon information and belief, CEP takes a varying, but significant percentage of the reimbursement that medical insurers pay for the services of CEP's partner physicians.

34.     CEP was founded in 1971 by Roy Stambaugh, M.D.

35.     CEP is now one of the larger physician practice companies in the United States, based on revenues, patient encounters, and the number of affiliated hospitals. In California alone, more than 1 in 4 Californians who visit an emergency room will be treated by a CEP physician.

36.     CEP's principal executive offices are located in Embryville, California and upon information and belief, much of CEP's training, billing and collections functions are based in CEP's executive offices.

37.     CEP is a privately held corporation that does not release tax or revenue, however, a 2010 press release stated it had received nearly $400,000,000.00 in revenue in 2010.

### E.      CEP's Interaction With Government Medical Insurers

38.      Hospitalists, Emergency Room physicians and Nurse Practitioners, like most physicians, are paid for their services primarily by submitting invoices to medical insurers and other payors, including Medicare and Medicaid. Upon information and belief, CEP, through its proprietary billing system, assumes responsibility for all billing, reimbursement, and collection processes relating to its doctors' and nurse practitioners' services.

39.      To accomplish this task, CEP uses proprietary software which CEP physician partners access through CEP's web-based portal.  After treating a patient, CEP's physician partners enter a collection of information into the CEP program, including basic patient information, a diagnosis, and a billing code that is supposed to correspond with the level of service provided by the hospitalist during a particular encounter.

40.      Upon information and belief, CEP has a department devoted to auditing the billing information entered by its hospitalists for completeness and accuracy, and preparing billing forms for each patient that are electronically submitted to payors.

41.      The Medicare program reimburses CEP for the services provided by its hospitalists based upon the rates in Medicare's Physician Fee Schedule (the "Fee Schedule"), which is updated annually.  Many other medical payors, including private insurers, base their reimbursement rates on the Fee Schedule.  The Fee Schedule is based upon various codes found in the American Medical Association's ("AMA") Current Procedural Terminology that correspond to the level of service provided ("CPT Codes").  CEP has adopted "shortcut" codes for its hospitalists to use that correspond with the CPT Codes.

42.     As seen from the selected CPT Codes below, the fees Medicare pays for services vary depending upon the complexity of the service provided and the amount of time expended in providing the service.

| CPT Code | Payment | Description of Services Provided[1] |
|---|---|---|
| 99221 | $101.41 | Initial hospital care, per day, for the evaluation and management of a patient, which requires these 3 key components:  A detailed or comprehensive history; A detailed or comprehensive examination; and Medical decision-making that is straightforward or of low complexity.  Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually, the problem(s) requiring admission are of low severity.  **Physicians typically spend 30 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99222 | $137.43 | Initial hospital care, per day, for the evaluation and management of a patient, which requires these 3 key components:  A comprehensive history; A comprehensive examination; and Medical decision making of moderate complexity.  Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually, the problem(s) requiring admission are of moderate severity.  **Physicians typically spend 50 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99223 | $202.06 | Initial hospital care, per day, for the evaluation and management of a patient, which requires these 3 key components:  A comprehensive history; A comprehensive examination; and Medical decision- |

---

[1]   The rate and description information is based upon 2014 Medicare reimbursement rates for services provided in a hospital facility with the Illinois carrier locality for Memorial Hospital entered.  Reimbursement rates vary geographically but the rates move in proportionate rates such that critical care time will always be reimbursed at a higher rate than ordinary care.

making of high complexity.  Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually, the problem(s) requiring admission are of high severity.  **Physicians typically spend 70 minutes at the bedside and on the patient's hospital floor or unit.**

| | | |
|---|---|---|
| 99231 | $38.99 | Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components:  A problem focused interval history; A problem focused examination; Medical decision making that is straightforward or of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually, the patient is stable, recovering or improving.  **Physicians typically spend 15 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99232 | $71.41 | Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components:  An expanded problem focused interval history; An expanded problem focused examination; Medical decision making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually, the patient is responding inadequately to therapy or has developed a minor complication.  **Physicians typically spend 25 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99233 | $102.80 | Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components:  A detailed interval history; A detailed examination; Medical decision making of high complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or |

|       |          | family's needs.  Usually, the patient is unstable or has developed a significant complication or a significant new problem.  **Physicians typically spend 35 minutes at the bedside and on the patient's hospital floor or unit.** |
|-------|----------|---------|
| 99291 | $223.40  | Critical Care, up to 70 minutes. Critical care services encompass both treatment of "vital organ failure" and "prevention of further life threatening deterioration of the patient's condition."   A critical illness or injury acutely impairs one or more vital organ systems such there is a <u>high probability of imminent or life threatening deterioration</u> in the patient's condition.  Critical care services must be medically necessary and reasonable. Services provided that do not meet critical care services or services provided for a patient who is not critically ill or injured in accordance with the above definitions and criteria, but who happens to be in a critical care, intensive care, or other specialized care unit should be reported using another appropriate E/M code (e.g., subsequent hospital care, CPT codes 99231-99233).The treatment and management of the patient's condition, while not necessarily emergent, shall be required, based on the threat of imminent deterioration (i.e., the patient shall be critically ill or injured at the time of the physician's visit.) |
| 99292 | $111.93  | Each Additional 30 Minutes of Critical Care Time – as defined above. |

43.    The above figures were accessed using the CMS.gov web portal, physician fee schedule search tool. A copy of those results is attached hereto as group Exhibit 1.

44.    As set forth below, CEP encourages and enables its physicians to upcode, specifically to bill for critical care time that is unjustified, when the hospitalist, emergency doctor or nurse practitioner actually only provided treatment that corresponds with a lower

level of service – 99231 or 99232. CEP then submits the upcoded invoices for payment by Medicare, Medicaid and other payors.

## V.  RELATOR, KEITH WERNER, RN

45.     Werner was born in 1960 and raised in Madison, Illinois, prior to receiving his medical training at State Community College. After receiving his nursing license, Werner began working full time as an Intensive Care Unit ("ICU") RN at St. Mary's Hospital in East St. Louis, Illinois. He also worked in the Emergency Department. In approximately 1985, Werner left St. Mary's to accept a full time staff position in the ICU at St. Elizabeth Medical Center in Granite City, Illinois. On February 1, 1991, Werner successfully obtained adult critical care certification by the American Association of Critical Care Nurses ("AACN"), which is nationally recognized as the authoritative group for critical care nursing in the United States. All times since 1991, Werner has maintained this certification in good standing. In 1993, Werner accepted a full time position as director of critical care medicine at Centreville/Touchette Regional Hospital ("Touchette"). In December 1995, Werner left Touchette to accept a full time position as director of critical care services at St. Elizabeth Medical Center overseeing a 12 bed ICU and a 28 bed acute medical care unit ("AMCU"). In 2001, Werner left that position to return to bedside critical care nursing at Memorial Hospital in Belleville. Throughout the time he has been employed at Memorial Hospital, Werner has maintained his certifications in critical care nursing, basic life support and advanced life support. Werner was one of a select group of ICU RNs who were chosen for advanced training in the care of recent post-operative cardiothoracic surgery patients. Werner also currently serves as preceptor and resource nurse for newly hired ICU nurses and cardiothoracic surgery nurses. Werner additionally serves as lead instructor and mentor for those learning to perform

continuous renal replacement therapy which is a continuous hemodialysis modality, only performed by ICU RNs in the ICU. Werner is frequently requested to teach critical care classes and serve as relief charge RN and resource RN. In early 2015, Werner received a nursing service excellence award.

46.     At all times relevant herein, Werner worked in the ICU at Memorial Hospital.

47.     As a critical care nurse, and as evidenced by the positions he holds and awards he has won, Werner is well respected by his fellow nursing staff and his fellow doctors.

48.     Werner was at the hospital when CEP took over the management of the Emergency Department and was also hired to provide hospitalists. This was the first time Werner witnessed doctors mass billing for critical care time for what he believed were non-critical care cases. Concerned about the overbilling, Werner reported his concerns to his supervisors, along with examples of upcoding. His supervisors took no action. Fearing that he might be terminated, Werner began collecting evidence to prove the upcoding scheme that was taking place at Memorial Hospital by CEP doctors.

## VI.     CEP'S UPCODING SCHEME

49.     Upon information and belief, CEP derives its revenues primarily by retaining a significant percentage of the amount it bills for the services of its hospitalists, emergency room physicians and nurse practitioners. CEP's revenues, therefore, are dependent upon the amount it can bill to medical insurers for the services performed by its hospital based partners.

50.     Because Medicare establishes reimbursement rates for physician services that other medical insurers generally follow, CEP cannot dictate, or even control, the price of specific services provided by its hospitalists, emergency room physicians or nurse practitioners.   Accordingly, CEP can grow revenues only by acquiring new hospitalists,

emergency room physicians or nurse practitioners, or by increasing the productivity of each of its hospitalists, emergency room physicians and nurse practitioners.

51.     The revenue generated per patient encounter can only increase if CEP medical professionals happen to treat a disproportionate number of critically ill patients, or if CEP hospitalists, emergency room physicians and nurse practitioners bill at higher levels for providing the same services or upcode the services they actually provided.

52.     CEP employs a strategy of upcoding that has its medical professionals bill for critical care treatments when such treatment was never provided, was unnecessary or was unfit of being labeled critical care. The results of CEP's efforts are evident in CEP hospitalists, emergency physicians and nurse practitioners' billing records, some of which Werner has collected.

**A.     Evidence of CEP's Upcoding Scheme**

53.     As a medical employee of Memorial Hospital, Werner has been able to witness and collect a variety of billing records that demonstrate CEP's success in encouraging its hospitalists, emergency physicians and nurse practitioners to engage in upcoding through both the unreasonably high billing patterns of CEP's hospitalists, emergency physicians and nurse practitioners and the billing patterns of previous hospitalists, emergency physicians and nurse practitioners that joined CEP after working with other physician groups or that do not work for CEP. In addition, many physicians who work at Memorial Hospital who are board certified in critical care have **never** billed for critical care time.

**(1)     Evidence of Upcoding Through Unreasonable Critical Care Labels**

54.     As described above, CPT codes are used by CMS and State Medicaid entities to properly compensate medical professionals for work performed.

55.     In a hospital setting, there are numerous CPT codes that can be used depending on the type of procedure performed. As described above, in a hospital setting, a patient being treated upon entry to the hospital would typically be coded as 99221, 99222 or 99223. Subsequent care may be coded as 99231-99233 as described above. In the case of a critically ill patient, however, the codes 99291 or 99292 would be used.

56.     Critical care is not, however, a catchall that applies to any treatment rendered in the emergency department or in the intensive care unit. Critical care does not depend on where the treatment is rendered but rather specifically what treatment is being rendered. Indeed, Centers for Medicare & Medicaid Services ("CMS") has specific guidelines for the limited actions that can be billed as critical care.

57.     On June 6, 2008, CMS issued CR 5993, which revised the *Medicare Claims Processing Manual* ("CMS Manual"), Chapter 12 (Physicians/Non-physician Practitioners), Section 30.6.12 (Critical Care Visits and Neonatal Intensive Care (Codes 99291-99292)), and replaced the previous critical care policy language in that section with new language and added general CMS evaluation and management payment policies which impact payment for the rendering of critical care services. (See Exhibit 2).

58.     This new language in the CMS Manual defines when it is appropriate for physicians to bill for what is termed critical care.

59.     "Critical care" is defined as "the direct delivery by a physician(s) medical care for a critically ill or critically injured patient." (Ex. 2).

60.     "A critical illness or injury acutely impairs one or more vital organ systems such there is a <u>high probability of imminent or life threatening deterioration</u> in the patient's condition." (emp. original) (Ex. 2).

61.    "Examples of vital organ system failure include, but are not limited to: central nervous system failure, circulatory failure, shock, renal, hepatic, metabolic, and/or respiratory failure." (*Id.*).

62.    The CMS Manual further states: "Although critical care typically requires interpretation of multiple physiologic parameters and/or application of advanced technology(s), critical care may be provided in life threatening situations when these elements are not present." (*Id.*).

63.    The CMS Manual also states, in regards to the use of "critical care" codes, that: "Providing medical care to a critically ill, injured, or post-operative patient qualifies as a critical care service only if both the illness or injury and the treatment being provided meet the above requirements." (*Id.*).

64.    The CMS Manual's next section is section B, headlined: "Critical Care Services and Medical Necessity," which states, in relevant part:

> "Critical care services must be medically necessary and reasonable. Services provided that do not meet critical care services or services provided for a patient who is not critically ill or injured in accordance with the above definitions and criteria, but who happens to be in a critical care, intensive care, or other specialized care unit should be reported using another appropriate E/M code (e.g., subsequent hospital care, CPT codes 99231-99233).
>
> As described in Section A, critical care services encompass both treatment of "vital organ failure" and "prevention of further life threatening deterioration of the patient's condition." Therefore, although critical care may be delivered in a moment of crisis or upon being called to the patient's bedside emergently, this is not a requirement for providing critical care service. The treatment and management of the patient's condition, while not necessarily emergent, shall be required, based on the threat of imminent deterioration (i.e., the patient shall be critically ill or injured at the time of the physician's visit.")

(*Id.* at Section B).

65.     Section B of the CMS Manual then proceeds to highlight situations where critical

care may be billed versus those situations where it may not. Section B finishes:

> "Providing medical care to a critically ill patient should not be automatically deemed to be a critical care service for the sole reason that the patient is critically ill or injured. While more than one physician may provide critical care services to a patient during the critical care episode of an illness or injury each physician must be managing one or more critical illness(es) or injury(ies) in whole or in part.
>
> **EXAMPLE:** A dermatologist evaluates and treats a rash on an ICU patient who is maintained on a ventilator and nitroglycerine infusion that are being managed by an intensivist. The dermatologist should not report a service for critical care.

(*Id.* at Section B).

66.     Section C of the CMS Manual is entitled as: "Critical Services and Full

Attention of the Physician." This section reads:

> The duration of critical care services to be reported is the time the physician spent evaluating, providing care and managing the critically ill or injured patient's care. That time must be spent at the immediate bedside or elsewhere on the floor unit so long as the physician is immediately available to the patient.
>
> For example, time spent reviewing laboratory test results or discussing the critically ill patient's care with other medical staff in the unit or at the nursing station on the floor would be reported as critical care, even when it does not occur at the bedside, if this time represents the physician's full attention to the management of the critically ill/injured patient.
>
> For any given period of time spent providing critical care services, the physician must devote his or her full attention to the patient and, therefore, cannot provide services to any other patient during the same period of time."

(*Id*. at Section C).

67.     The in-person observations by Werner, and billing records reviewed by Werner,

described below, include a detailed description of the actual services provided by the particular

CEP hospitalist, emergency room physician or nurse practitioner on the day in question and

present, among other things, the following information:  the name and age of the patient, a

description of the treatment and the type of CPT code entered by the CEP physician partner.

Evidence of upcoding can be seen through the type of care that was rendered or the status of the patient and the CPT code that was actually used.

68.     The billing records clearly reveal that the CEP hospitalists, emergency physicians and nurse practitioners disproportionately, if not exclusively, used the highest level CPT Codes – critical care billing - for any particular activity.

69.     As described above, Government payors reimburse physicians based upon the CPT Codes that correspond with the level of service provided.

70.     The reimbursement rate for services provided varies greatly depending on the CPT code entered.

71.      The records described below demonstrate a disproportionately high use of the highest level CPT Codes, and almost no use of the lowest level CPT Codes.  Indeed, the records analyzed below all reflect the use of critical care levels of treatment for care that was decidedly not critical care.

72.     Additionally, it should be noted that this conduct is restricted solely to CEP affiliated physicians and nurse practitioners.

(a)     **Satyen Patel**

73.     Satyen Patel ("Patel") is a CEP Hospitalist who works at Memorial Hospital in Belleville, Illinois. Patel was a hospitalist on duty on February 22, 2015. On that date, a 69 year old male, Medicare A&B patient was transferred from Breese Hospital to Memorial Hospital. The patient had been admitted to Breese Hospital complaining of shortness of breath and had been at that hospital in stable condition for 2 days. The patient was transferred to Memorial Hospital for evaluation by a cardiologist and pulmonologist. Patel is neither. In the patient's admission history and physical, Patel billed for 50 minutes of critical care time and

noted that patient was there for consult by cardiologist and pulmonologist. When the patient was subsequently examined by a pulmonologist and cardiologist, neither billed for critical care time. Patel did not note what type of critical care he provided nor that patient was in any imminent danger.

        **(b)**      <u>**Patient A**</u>

     74.     Patient A presented to the hospital on March 9, 2015. Patient A was a 48 year old female on Illinois Medicaid. Patient A was transported to the hospital complaining of shortness of breath. The patient had an endotracheal tube placed upon arrival at 8:30 p.m. At 12:59 a.m. on March 10, 2015, CEP Nurse Practitioner Kim Mank, ("Mank") dictated the admission history and physical. Mank billed for 60 minutes of critical care time, noting in the bill a "patient with life threatening illness requiring frequent assessment and adjustments in treatment" though there is no evidence in the medical records of such and the term "life threatening illness" means nothing when determining whether critical care was appropriate. Patient A was next seen, hours later, by CEP Hospitalist Behfar Dianati ("Dianati"). Dianati dictated a progress note that he "agree with plan of care" and that Patient A was "still intubated" and then billed for 60 minutes of critical care time. Dianati made no notation as to what condition he treated for those 60 minutes of critical care time such that Patient A was in imminent risk of death or organ failure. On March 12, 2015, Dianati again followed up with Patient A. Dianati's progress note states that Patient A is "extubated," "sleeping well," "feeling better," "denies nausea and vomiting," "foley catheter removed" and then proceeds to bill for 60 minutes of critical care time.

(c)      **Patient B**

75.      Patient B presented to the hospital on March 11, 2015. Patient B is a 75 year old male. Patient B was initially seen by CEP Hospitalist Maria Scarbrough ("Scarbrough"). Scarbrough recorded "condition fair" in the initial progress note. A triple lumen central line catheter was inserted and patient was started on low dose dopamine IV, presumably for low blood pressure. Scarbrough billed for 60 minutes of critical care time. At 8:12 a.m. on March 11, 2015, CEP Nurse Practitioner Bobby Blum ("Blum") entered an admission order for telemetry bed, not the Intensive Care Unit ("ICU"). Blum entered the admission history and physical progress notes and billed for 45 minutes of critical care time. This is despite the fact Patient B's history and physical were unremarkable. Dianati co-signed Blum's note, which is required for a nurse practitioner to bill critical care time. Dianati did not change or alter the critical care time, but rather placed an addendum that Patient B "might go to IMCU or even telemetry."

(d)      **Patient C**

76.      Patient C presented to the hospital on March 12, 2015. Patient C is a 56 year old female who is blind and disabled, and on Medicare Parts A&B as well as Medicaid. Patient C was seen in the emergency room by CEP Emergency Physician Andrew Harger ("Harger"). Harger noted that patient was chronically ill, blind, with history of diabetes mellitus and presumed to be suffering from Diabetic Ketoacidosis or DKA. Memorial Hospital has a pre-printed protocol for the nursing staff to follow when a patient presents with DKA which directs the nursing staff on administering fluids, electrolytes and insulin depending on presentation and symptoms. The role of the doctor treating a patient with DKA is simply to order the DKA protocol. Nonetheless, at 5:30 p.m., Harger billed for 35 minutes of critical

care time. At 9:45 p.m. on the same date, a CEP Hospitalist documented admission history and physical for Patient C and billed another 55 minutes of critical care time. The note by this CEP hospitalist stated: "Patient Seen at 9:25 p.m." There is no other justification given for critical care billing nor is there an explanation as to why the hospitalist billed for 55 minutes of critical care time when patient was seen at 9:25 p.m. and the note was entered only 20 minutes later at 9:45 p.m.

      **(e)**     **Patient D**

77.     Patient D is a 21 year old female on Illinois Medicaid insurance. Patient D presented to the hospital on March 14, 2015, with elevated blood sugar and stated that she had been out of insulin for two days. Her pregnancy test indicated she was likely 3 weeks pregnant at time of admission. She was admitted with a diagnosis of DKA. In the emergency department, she was given a liter of fluid to rehydrate, Zofran for nausea/vomiting, 10 units of insulin and an insulin IV drip was started. She was then placed on the Memorial Hospital DKA protocol. Over an hour later, CEP Emergency physician Delwin Merchant ("Merchant") recorded 35 minutes of critical care time.

      **(f)**     **Patient E**

78.     Patient E is a 56 year old male with private insurance.[2] He presented to Memorial Hospital on March 12, 2015 with a history of COPD and complaining of shortness of breath. At 6:10 a.m., CEP Emergency physician Craig Brummer ("Brummer") documents 45 minutes of critical care time, yet in his physician note refers to Patient E as "stable." At 10:06 a.m., CEP Hospitalist Chingqing Zhao ("Zhao") enters an order to admit patient to IMCU (not ICU). At 12:24 p.m., the patient is on bi-pap, not a ventilator. Nonetheless, CEP Nurse Practitioner Deanna Rodenberg ("Rodenberg") lists 35 minutes of critical care time

--------

[2] Example included simply to show pattern and practice of continuous upcoding regardless of patient or insurer.

which is signed off on by Zhao. At 1:44 p.m., Pulmonologist Eduardo Martinez, who is not a CEP affiliated physician, examines Patient E and makes adjustments to care and enters orders reflecting the same but does not bill for critical care time. On March 13, 2015, at 3:54 p.m., Zhao documents "The current[3] time 60 minutes, including repeated assessments and plans, consulting specialist," "continue in IMCU for close monitoring." On March 14, 2015, at 8:59 a.m., Zhao documented: "The current[4] Time is 40 minutes including repeated assessment and plans, consulting specialist," "continue in IMCU for close monitoring." The presumed "specialist" Zhao was referring to was a pulmonologist. In this case, however, and showing the nature of the upcoding scheme, the pulmonologist had already seen the patient at 8:33 a.m. on March 14, 2015, some 26 minutes before Zhao dictated that he had just spent 40 minutes providing critical care. The pulmonologist was Doug Dothager ("Dothager") who is not affiliated with CEP. Dothager is not only board certified in pulmonology, but he is also board certified in critical care. Zhao is not board certified in critical care. At 8:33 a.m. on March 14, 2015, which would have been during the time Zhao was allegedly providing 45 minutes of critical care time, board certified pulmonologist and board certified critical care physician Dothager noted that Patient E was in "no distress," "continue steroids and Bi-Pap." Dothager charged no critical care time.

     **(g)**     **Patient F**

79.     Patient F was a 20 year old male with private insurance.[5] Patient F presented on March 15, 2015. Patient F was extremely overweight and had been sick at home for a few

---

[3] This note was entered by voice dictation. Upon information and belief, Dr. Zhao stated critical care time but the dictation machine heard "current" due to Zhao's accent. Upon information and belief, the medical billing sent by CEP for this patient will reflect critical care time and there is no other billing term that could be confused with "current" other than "critical care."

[4] As in footnote 2, upon information and belief, "current" means "critical care."

[5] Non-Medicare/Medicaid insurance included to show scheme of upcoding in all cases.

days. Patient F had been difficult to arouse and unable to get out of bed. He was transported to Memorial Hospital by EMS (ambulance). Upon arrival, it was noted that Patient F had low blood oxygen and an elevated white blood cell count indicating infection. His chest x-ray showed infiltrates with cardiomegaly which meant Patient F likely had pneumonia and/or congestive heart failure and an enlarged heart. In the emergency room, he was placed on Bi-Pap. Dr. Ortega, a non-CEP affiliated physician was consulted on his arrival and went to emergency room to direct care of patient. Dr. Ortega is board certified in pulmonology and also board certified in critical care. Throughout his evaluation and treatment of Patient F, Dr. Ortega billed no critical care time. CEP Emergency department physician Zachary Rynerson ("Rynerson"), however, listed 40 minutes of critical care time in a note at 12:05 p.m. in a note he electronically signed at 2:41 p.m. CEP Emergency physician Harger also billed for 40 minutes of critical care time, with the notation: "critical care time directly supervised by me at all times." This note was filed at 12:29 p.m., presumably covering the exact same time as Rynerson and Ortega.

### (h)   **Patient G**

80.     Patient G presented to the hospital on February 12, 2015. Patient G is a 60 year old female. At 3:00 a.m., Patient G was seen by a pulmonologist and nephrologist who stabilized the patient. At 7:00 a.m., CEP Hospitalist Ahmad Rez came on duty. He thereafter billed for 80 minutes of critical care time to Patient G despite the fact that Patient G was stable.

### (i)   **Patient H**

81.     Patient H was a patient in the hospital on December 13, 2014. Patient H is a 85 year old male. Patient H was admitted to the ICU for monitoring because he was receiving

intra-arterial TPA drug to dissolve a clot in an artery in his leg. On this date, Patient H went to cardiac cath lab twice for extended procedures by his vascular surgeon, Robert Lee, M.D. His care in the hospital was being managed by Dr. Lee. Patient H spent only a few hours in ICU on December 13, 2014. While Relator was on duty, on at least two occasions, CEP Hospitalist Zhao came to the ICU in an attempt to see Patient H. Zhao was told Patient H was in the cath lab, to which Zhao remarked, "How am I supposed to bill patient?" The charge nurse in the ICU offered to take Zhao to the cath lab to see Patient H but Zhao declined. At approximately 1:30 p.m., the electronic records system in the hospital failed and the hospital went to back up paper charting. At approximately 6:30 p.m., Zhao came to the ICU with a paper progress note and order sheet and asked that it be placed in Patient H's chart when Patient H returned from the cath lab. That note from Zhao ordered a few routine lab tests and included a minimal, generic progress note. Zhao also billed for 45 minutes of critical care time. Relator asked Zhao if he had gone to the cath lab to treat the patient. Zhao said he had not but had seen Patient H earlier that morning in the ICU. Relator knew this to be impossible as Relator had been present in the ICU and knew Zhao had not seen Patient H that day. Relator reported this incident to hospital administration which, upon information and belief, took no action.

        **(j)**    **Patient I**

82.     Patient I was a patient at Memorial Hospital on February 28, 2015. Patient I was a 61 year old male who was in the ICU and who also had a do not resuscitate order ("DNR"). A DNR is intended to insure that life saving measures are not undertaken if needed and that patient be allowed to expire. This would render critical care time, which is only billable in life threatening situations, unavailable as a billing quantifier. Nonetheless, on February 28, 2015, at 8:24 a.m., CEP Hospitalist Zhao billed for 50 minutes of critical care

time. Relator was present on this date and knew that Zhao had not seen Patient I for more than 2 minutes. Further, the progress note entered by Zhao was nearly an exact replica of the previous day's progress note. On March 1, 2015 at 8:02 a.m., Zhao entered 50 minutes of critical care time for Patient I and recorded a nearly identical copy of the previous day's progress note. At 10:09 a.m. on the same date, Zhao revised his previous billing to 40 minutes of critical care time and noted "repeated assessments and plans, consulted specialists." Zhao did not describe what kind of critical care services he provided nor did he note the fact that Patient I had a DNR order in place.

83.    CEP's upcoding scheme adversely impacts patient care in a number of ways.

84.    First and foremost, CEP's upcoding practices cost Government medical insurers millions of dollars annually, preventing those programs from covering other, legitimate medical expenses.

85.    CEP's culture, including, upon information and belief, the pressure it applies to hospitalists, emergency physicians and nurse practitioners to increase their total billing, and CEP's failure to curtail billing irregularities, causes a variety of additional harm to its patients from increased cost to actual lack of treatment.

86.    Finally, CEP's upcoding scheme has created a culture that emphasizes and rewards the type of care billed for, rather than the quality of care each patient receives.  That culture has led to instances of CEP hospitalists billing for treating patients that were never even seen, as noted above.

87.    CEP submitted claims for payment to the Government with respect to each of the CEP hospitalists described in this Complaint and, upon information and belief, for all CEP

hospitalists, emergency physicians and nurse practitioners who were, and are, practicing at CEP managed hospitals where, upon information and belief, these same practices occur.

88.     Upon information and belief, CEP's practices are nationwide, as evidenced by the following facts:   CEP's training staff serves CEP's hospitalists nationwide; CEP's compensation program applies to all CEP hospitalists, emergency physicians and nurse practitioners; CEP's monitoring capabilities cover CEP's hospitalists nationwide; CEP applies uniform policies nationwide; and CEP encourages its hospitalists, emergency physicians and nurse practitioners to increase their total billings by comparing them to other CEP hospitalists from around the country.

## <u>COUNT I</u>
### (Violation of the Federal False Claims Act)

89.     Plaintiff-Relator Werner realleges and incorporates by reference the allegations made in Paragraph 1 through 88 of this Complaint as though fully set forth herein.

90.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended for each and every instance of upcoding by Defendants.

91.     Prior to May 20, 2009, 31 U.S.C. § 3729(a) provided, in relevant part, liability for any person who –

(1)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false  or  fraudulent claim paid or approved by the Government;

(3)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . .

(7)      knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . .

88.     On May 20, 2009, 31 U.S.C. § 3729(a) was amended to provide, in relevant part, liability for:

(1)      any person who –

(A)      knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)      knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)      conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .

(G)      knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . .

92.     Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in violation  of  31 U.S.C.  § 3729(a)(l) and continue to do so in violation of 31 U.S.C. § 3729(a)(l)(A), as amended on May 20, 2009.

93.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(l)(B), as amended on May 20, 2009.

94.     Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and CEP hospitalists to defraud the United States Government by knowingly presenting, or causing to be presented to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(3) and continue to do so in violation of 31 U.S.C. § 3729(a)(l)(C), as amended on May 20, 2009.

95.     Defendants also conspired among themselves and CEP hospitalists, emergency physicians and nurse practitioners to defraud the United States Government by knowingly making, using or causing to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(3) and, upon information and belief, continue to do so in violation of 31 U.S.C. § 3729(a)(l)(C), as amended on May 20, 2009.

96.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government in violation of 31 U.S.C. § 3729(a)(7) and 31 U.S.C. § 3729(a)(l)(G), as amended on May 20, 2009.

97.     Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

98.     The United States Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid

and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

99.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

<u>**COUNT II**</u>
**(Violation of the California False Claims Act)**

100.     Plaintiff-Relator Werner realleges and incorporates by reference the allegations made in Paragraph 1 through 99 of this Complaint as though fully set forth herein.

101.     This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code §§ 12650, *et seq*.

102.     Cal. Gov't Code § 12651(a) provides liability for any person who –

    (1)     Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

    (2)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision.

    (3)     Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

103.     Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of California or a political subdivision thereof, false claims for payment or approval in violation of Cal. Gov't Code § 1265l(a)(l).

104.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false

claims paid or approved by the State of California or a political subdivision thereof in violation of Cal. Gov't Code § 1265l(a)(2).

105.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and CEP hospitalists, emergency physicians and nurse practitioners to defraud the State of California or a political subdivision thereof by getting a false claim allowed or paid by the State of California or a political subdivision thereof in violation of Cal. Gov't Code § 12651(a)(3).

106.    Defendants knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

107.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

108.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT II
### (Violation of the Georgia False Medicaid Claims Act)

109.    Plaintiff-Relator Werner realleges and incorporates by reference the allegations made in Paragraph 1 through 108 of this Complaint as though fully set forth herein.

110.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168, *et seq*.

111.    Ga. Code Ann. § 49-4-168.1 provides liability for any person who –

(1)     Knowingly presents or causes to be presented to the Georgia Medicaid Program a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3)     Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid . . .

112.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the Georgia Medicaid program false or fraudulent claims for payment or approval in violation of Ga. Code Ann. § 49-4-168.1 (1).

113.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program in violation of Ga. Code Ann. § 49-4-168.1(2).

114.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and CEP hospitalists, emergency physicians and nurse practitioners to defraud the Georgia Medicaid program by getting false or fraudulent claims paid or approved by the Georgia Medicaid program in violation of Ga. Code Ann. § 49-4-168.1(3).

115.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

116.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

117.   By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT III
### (Violation of the Illinois Whistleblower Reward and Protection Act)

118.   Plaintiff-Relator Werner realleges and incorporates by reference the allegations made in Paragraph 1 through 117 of this Complaint as though fully set forth herein.

119.   This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*

120.   Section 3 of the Illinois Whistleblower Reward and Protection Act provides liability for any person who -

> (1)   knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

> (2)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or  fraudulent claim paid or approved by the State;

> (3)   conspires to defraud the State by getting a false or fraudulent claim allowed or paid . . .

121.   Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Illinois false or fraudulent claims for payment or approval in violation of 740 ILCS 175/3(a)(l).

122.   Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or

fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 1 75/3(a)(2).

123.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and CEP hospitalists, emergency physicians and nurse practitioners to defraud the State of Illinois by getting false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS l75/3(a)(3).

124.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

125.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

126.    By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

<u>COUNT IV</u>
**(Violation of the Tennessee Medicaid False Claims Act)**

127.    Plaintiff-Relator Werner realleges and incorporates by reference the allegations made in Paragraph 1 through 126 of this Complaint as though fully set forth herein.

128.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181, *et seq*.

129.    Tenn. Code Ann. § 71-5-182(a)(l) provides liability to any person who -

(A)    Presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing such claim is false or fraudulent;

(B)     Makes, uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the medicaid program   paid  for or approved  by the state knowing such record or statement is false;

(C)     Conspires to defraud the state by getting a claim allowed or paid under the medicaid program knowing such claim is false or fraudulent . . .

130.    Through the acts described above, Defendants and their agents and employees presented, or caused to be presented, to officers, employees, or agents of the State of Tennessee claims for payment under the Tennessee Medicaid program knowing such claims were false or fraudulent, in violation of Tenn. Code Ann. § 71-5-182(a)(l)(A).

131.    Through the acts described above, Defendants and their agents and employees made, used, or caused to be made or used, false records or statements to get false or fraudulent claims under the Tennessee Medicaid program paid for or approved by the State of Tennessee knowing such records or statements to be false, in violation of Tenn. Code Ann. § 71-5-182(a)(l)(B).

132.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and CEP hospitalists, emergency physicians and nurse practitioners to defraud the State of Tennessee by getting claims allowed or paid under the Tennessee Medicaid program knowing such claims were false or fraudulent, in violation of Tenn. Code Ann. § 71-5-182(a)(l)(C).

133.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

134.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

135.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

<u>COUNT V</u>
**(Violation of the Texas Medicaid Fraud Protection Act)**

136.    Plaintiff-Relator Werner realleges and incorporates by reference the allegations made in Paragraph 1 through 135 of this Complaint as though fully set forth herein.

137.    This is a claim for double damages and civil penalties under the Texas Medicaid Fraud Protection Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq*.

138.    Tex. Hum. Res. Code Ann. § 36.002 provides liability to any person who -

(1)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2)    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;…

(4)    knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:…

(B)    information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;…

(7)    knowingly makes a claim under the Medicaid  program for:

(B)    a service or product that  is  substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or…

(9)     knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent.

139.    Through the acts described above, Defendants and their agents and employees knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit Defendants to receive payments under the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

140.    Through the acts described above, Defendants and their agents and employees knowingly concealed or failed to disclose information that permitted Defendants to receive payments under the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

141.    Through the acts described above, Defendants and their agents and employees knowingly made, caused to be made, induced, or sought to induce the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Texas Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

142.    Through the acts described above, Defendants and their agents and employees knowingly made claims under the Texas Medicaid program for services that were substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(B).

143.    Through the acts described above and otherwise, Defendants entered into one or more agreements, combinations or conspiracies among themselves and CEP hospitalists, emergency physicians and nurse practitioners to defraud the State of Texas by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Texas Medicaid program or a fiscal agent, in violation of Tex. Hum. Res. Code Ann. § 36.002(9).

144.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

145.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

146.    By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT VI
### (Violation of the Maryland False Health Claims Act)

147.    Plaintiff-Relator Werner realleges and incorporates by reference the allegations made in Paragraph 1 through 146 of this Complaint as though fully set forth herein.

148.    This is a claim for triple damages and civil penalties under the Md. Code Ann. Health-Gen. §§ 2-601, *et seq*.

149.    Md. Code Ann. Health-Gen. § 2-602(a) provides, in relevant part, that a person may not:

> (1)    knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2) knowingly make, use or cause to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation under this subtitle; …

150. Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the Maryland Medicaid program false or fraudulent claims for payment or approval in violation of Md. Code Ann. Health-Gen. § 2-602(a)(1).

151. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Maryland Medicaid program in violation of Md. Code Ann. Health-Gen. § 2-602(a)(2).

152. Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and CEP hospitalists, emergency physicians and nurse practitioners to defraud the Maryland Medicaid program by getting false or fraudulent claims paid or approved by the Maryland Medicaid program in violation of Md. Code Ann. Health-Gen. § 2-602(a).

153. Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

154. The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

155.    By reason of Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

<u>COUNT VI</u>
**(Violation of the Maryland False Health Claims Act)**

156.    Plaintiff-Relator Werner realleges and incorporates by reference the allegations made in Paragraph 1 through 155 of this Complaint as though fully set forth herein.

157.    This is a claim for triple damages and civil penalties under the Md. Code Ann. Health-Gen. §§ 2-601, *et seq*.

158.    Md. Code Ann. Health-Gen. § 2-602(a) provides, in relevant part, that a person may not:

(1)    knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2)    knowingly make, use or cause to be made or used a false record or statement material to a false or fraudulent claim;

(3)    Conspires to commit a violation under this subtitle; …

159.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the Maryland Medicaid program false or fraudulent claims for payment or approval in violation of Md. Code Ann. Health-Gen. § 2-602(a)(1).

160.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Maryland Medicaid program in violation of Md. Code Ann. Health-Gen. § 2-602(a)(2).

161.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and CEP hospitalists, emergency physicians and

nurse practitioners to defraud the Maryland Medicaid program by getting false or fraudulent claims paid or approved by the Maryland Medicaid program in violation of Md. Code Ann. Health-Gen. § 2-602(a).

162.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

163.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

164.    By reason of Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

<u>**COUNT VII**</u>
**(Violation of the Washington Medicaid False Claims Act)**

165.    Plaintiff-Relator Werner realleges and incorporates by reference the allegations made in Paragraph 1 through 164 of this Complaint as though fully set forth herein.

166.    This is a claim for triple damages and civil penalties under Wash. Rev. Code §§ 74.66.005, *et seq*.

167.    Wash. Rev. Code § 74.66.020(1) provides, in relevant part, that it is unlawful if a person:

> (a)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (b)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c)     Conspires to commit one or more of the violations in this subsection (1);
…

168.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the Washington Medicaid program false or fraudulent claims for payment or approval in violation of Wash. Rev. Code § 74.66.020(1)(a).

169.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Washington Medicaid program in violation of Wash. Rev. Code § 74.66.020(1)(b).

170.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and CEP hospitalists, emergency physicians and nurse practitioners to defraud the Washington Medicaid program by getting false or fraudulent claims paid or approved by the Washington Medicaid program in violation of Wash. Rev. Code § 74.66.020(1)(c).

171.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

172.    The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

173.    By reason of Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT VIII
### (Violation of the District of Columbia False Claims Act)

174.    Plaintiff-Relator Werner realleges and incorporates by reference the allegations made in Paragraph 1 through 173 of this Complaint as though fully set forth herein.

175.    This is a claim for triple damages and civil penalties under D.C. Code Ann. §§ 2-381.01, *et seq*.

176.    D.C. Code Ann. §§ 2-381.02(a) provides, in relevant part, that it is unlawful if a person:

    (1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; …

    (7)    Conspires to commit one or more of the violations in this subsection (1); …

177.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the District of Columbia Medicaid program false or fraudulent claims for payment or approval in violation of D.C. Code Ann. §§ 2-381.02(a)(1).

178.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the District of Columbia Medicaid program in violation of D.C. Code Ann. §§ 2-381.02(a)(2).

179.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and CEP hospitalists, emergency physicians and nurse practitioners to defraud the District of Columbia Medicaid program by getting false or

fraudulent claims paid or approved by the District of Columbia Medicaid program in violation of D.C. Code Ann. §§ 2-381.02(a)(7).

180.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

181.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

182.    By reason of Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Plaintiff-Relator Werner, on behalf of the United States of America and the States of California, Georgia, Illinois, Maryland, Tennessee, Texas, Washington and Washington, D.C., demands that judgment be entered against Defendants CEP AMERICA, LLC, CEP America-Illinois, P.C., CEP AMERICA-GEORGIA, P.C., CEP AMERICA-TENNESSEE, P.C., CEP AMERICA-TENNESSEE, PLLC, CEP AMERICA-TEXAS PLLP, CEP AMERICA-MARYLAND, P.C., CEP AMERICA-MARYLAND, LLP, CEP AMERICA-WASHINGTON, PLLC, CEP AMERICA-WASHINGTON II, P.C., CEP AMERICA-DISTRICT OF COLUMBIA I, P.C.,  and CEP AMERICA-DISTRICT OF COLUMBIA, LLP, ordering that:

As to the Federal Claims:

(a)    Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States

Government has sustained as a result of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §§ 3729(a);

(b)    Relator be awarded his relator's share of the judgment to the maximum amount provided pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

(c)    Relator be awarded all costs and expenses of this action, including attorney's fees pursuant to 31 U.S.C. § 3730(d); and

(d)    Relator and the United States of America be awarded such other and further relief as the Court may deem to be just and proper.

As to the State Claims:

(e)    Relator and each named State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each State as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants within each State, all as provided by: Cal. Gov't Code § 12651; Ga. Code Ann. § 49-4-168.l(a); 740 Ill. Comp. Stat. 175/3; Md. Code Ann. Health-Gen. § 2-602(b)(1)(ii), Tenn. Code Ann. § 71-5-182; Wash. Rev. Code § 74.66.020(1); and D.C. Code Ann. §§ 2-381.02(a).

(f)    Relator and Plaintiff State of Texas be awarded statutory damages in an amount equal to two times the amount of actual damages that Texas has sustained as a result of Defendants'

actions, as well as the maximum statutory civil penalty for each violation of Tex. Hum. Res. Code Ann. § 36.002;

(g)     Relator be awarded his relator's share of any judgment to the maximum amount provided pursuant to: Cal. Gov't Code § 12652(g); Ga. Code Ann. § 49-4-168.2(i); 740 Ill. Comp. Stat. 175/4(d); Md. Code Ann. Health-Gen. § 2-605; Tenn. Code Ann. § 71-5-183(d); Tex. Hum. Res. Code Ann. § 36.11O; Wash. Rev. Code § 74.66.070; and D.C. Code Ann. §§ 2-381.03

(h)     Relator be awarded all costs and expenses associated with each of the pendent State claims, plus attorneys' fees, as provided pursuant to:   Cal. Gov't Code § 12652(g)(8); Ga. Code Ann. § 49-4-168.2(i); 740 Ill. Comp. Stat. 175/4(d); Md. Code Ann. Health-Gen. § 2-605; Tenn. Code Ann. § 71-5-183(d); Tex. Hum. Res. Code Ann. § 36.110; (WASH AND WASH D.C.) and Wash. Rev. Code § 74.66.070; and D.C. Code Ann. §§ 2-381.03

(i)     Relator and the State Plaintiffs be awarded such other and further relief as the Court may deem to be just and proper.

## **TRIAL BY JURY**

Relator hereby demands a trial by jury as to all issues.

Respectfully submitted,


By:   /s/ David Cates
David Cates
Ryan J. Mahoney
**CATES MAHONEY, LLC**
216 West Pointe Drive, Suite A
Swansea, IL  62226
Telephone:        618-277-3644
Facsimile:                618-277-7882
E-mail:             dcates@cateslaw.com
                        rmahoney@cateslaw.com

-and-


Eric D. Holland
R. Seth Crompton
**HOLLAND LAW FIRM**
300 N. Tucker, Suite 801
St. Louis, MO  63101
Telephone:        314-241-8111
Facsimile:                314-241-5554
E-mail:             eholland@allfela.com
                        scrompton@allfela.com

*Attorneys for Relator*